RYAN v. SEABOARD & R. R. CO. et al.

(Circuit Court, E. D. Virginia. September 12, 1898.)

1. EQUITY PRACTICE — FAILURE TO OBSERVE RULES — DISCRETION AS TO DISMISSAL.

Equity Rule 38 is not absolute in its requirements, and though a plaintiff fails to reply or to set down for argument a plea and demurrer filed by defendant, as required by the rule, the court may, in its discretion, refuse to dismiss the bill.

2. RES JUDICATA—JUDGMENT OF DISMISSAL.

A judgment of dismissal because of the failure of plaintiff to observe a rule of court does not render the matters involved in the suit res judicata.

3. EQUITABLE JURISDICTION—SUFFICIENCY OF BILL—SUIT BY STOCKHOLDER.

A bill alleging that plaintiff purchased from the owner certain shares of stock in defendant corporation, represented by a certificate which had been placed in the hands of another defendant under a pooling arrangement between stockholders, but that such defendant had surrendered said certificate and fraudulently procured its cancellation and the issuance of a new certificate to himself in lieu thereof, and praying the cancellation of such new certificate and the establishment of plaintiff's rights as a stockholder, states matters giving a court of equity jurisdiction.

4. FEDERAL COURT—JURISDICTION—AMOUNT IN CONTROVERSY.

Such a bill, which alleges the amount of stock so purchased to have been 153 shares, of the par value of $100 each, and of greater market value, and that plaintiff cannot obtain the legal title thereto and the right to vote thereon without possession of the original certificate so fraudulently canceled and in the possession of defendants, shows on its face that the amount in controversy exceeds $2,000.

5. PARTIES—STOCKHOLDERS IN CORPORATION—SUIT TO DISSOLVE POOL AGREEMENT.

Stockholders in a corporation who have formed a pool for their "mutual protection," in accordance with which they have deposited their stock with trustees, are necessary parties, either individually or by representatives, to a suit to have such pool declared illegal and void, and they are not represented in such suit by the trustees, whose interests are, under the allegations of the bill, antagonistic to those of the other members.

6. SAME—SALE OF STOCK.

Persons who have sold their stock in a corporation, and parted with all their interest therein, are not necessary parties to a bill challenging the power of the purchaser to hold the stock, and charging that the purchase was fraudulently made with funds of the corporation, though the stock still stands in their names on the books of the corporation, for the purpose, as is alleged, of giving it greater voting power under the charter.

7. EQUITY PLEADING—MULTIFARIOUSNESS.

A bill, the object of which is to obtain possession of a certificate of stock in a corporation, purchased by plaintiff from the person to whom it was issued, but which it is alleged has been fraudulently surrendered to and canceled by the corporation and is in its possession, is not multifarious, because, as a necessary incident to plaintiff's right to the relief asked, it attacks the validity of a pooling agreement between stockhold-

ers, to which neither the defendant corporation nor its president, necessary parties to the bill, were parties.

8. ABATEMENT—PENDENCY OF SUIT IN ANOTHER CIRCUIT.
    Whether a plea of the pendency of a suit in one circuit court of the United States is a bar to a suit on the same subject-matter, between the same parties, in another circuit court, quære. The court to which such plea is presented will, however, as a matter of comity, suspend proceedings in the suit until the matter has been in some manner disposed of by the court first obtaining jurisdiction.

This was a bill in equity by Thomas F. Ryan against the Seaboard & Roanoke Railroad Company and others to establish the plaintiff's rights as a stockholder in defendant company.

Elihu Root, Wm. L. Marbury, D. L. Groner, and Stiles & Holladay, for complainant.

Fisher, Bruce & Fisher and Watts & Hatton, for defendants.

SIMONTON, Circuit Judge. The complainant, Thomas F. Ryan, a citizen of the state of New York, filed his bill of complaint against the Seaboard & Roanoke Railroad Company and Legh R. Watts, citizens of the state of Virginia, the Raleigh & Gaston Railroad Company, a citizen of the state of North Carolina, and Messrs. Hoffman, McLane, Minis, Nippe, and Fisher, citizens of the state of Maryland. The bill is by a stockholder in the first-named corporation, in behalf of himself and other stockholders. After stating what is the Seaboard & Roanoke Railroad Company, it avers that it is in the control of eight subordinate railroad companies, constituting with it a system, designated by the style of the "Seaboard Air Line." Of one of these subordinate corporations, the Raleigh & Gaston Railroad Company, it owns a majority of the stock therein, and absolutely controls the election of its directors and other officers, and its operations, policy, income, and assets. The affairs of this Seaboard & Roanoke Railroad Company are managed by a president and six directors, elected by the persons in whose names shares of stock stand on the books of the company, according to a graduated scale of voting, whereby smaller stockholders have a much greater vote, in proportion to their holdings, than larger stockholders. That the annual meeting of the company, at which stockholders elected the president and directors, was approaching. That at the last meeting the defendant Hoffman had been elected president, and Messrs. McLane, Fisher, and Watts, with Moncure D. Robinson, Fuller, and Gordon, directors, of whom Robinson had died. That Hoffman had been continuously president since 1892, owning $20,800 of stock, and that since his election no dividends had been declared, although this had not been the case with his predecessors. That he controlled the elections by the use of proxies, which his position enabled him to solicit and obtain. That Messrs. Watts, McLane, and Robinson had been directors continuously during the presidency of Hoffman; McLane being a relative and occupying the same office room with him, Robinson being the owner of an unremunerative branch railroad, which he desired to lease to the Seaboard system at an exorbitant rental, and in which purpose he had succeeded, and Mr. Watts being the general counsel of the system

and president of a bank in which it made a goodly part of its deposits. The bill further charged that President Hoffman was in the receipt of large salaries from divers roads in the system, and that he was a member of the firm of R. C. Hoffman & Co., a firm with no stock or material on hand, but which was the purchasing and selling agent of the system, by which means, acting as the middleman, it made very large profits illegitimately, greatly to the detriment of the interests of the system. It is not alleged or charged that either McLane or Mr. Watts shared in these illicit gains. In October, 1896, large purchases of stock of the Seaboard & Roanoke Company had been made, which threatened a change in the election of directors, and Messrs. Hoffman, McLane, Robinson, and Watts, in order to perpetuate the control they theretofore had in this system, devised a plan for pooling the stock. To this end a pooling agreement was prepared and circulated among the stockholders, whereby the signers agreed for five years not to sell or dispose of their stock, or to delegate the voting power thereof, to any person other than these three directors, without the written consent of three-fourths of the aggregate shares of the signers of this agreement, and further authorizing these directors to vote as proxy for all such of the signers of the agreement who should not be present in person at any meeting of the company. That this pooling agreement was signed by persons holding 8,321 shares, but that Louis McLane, chairman of the pooling committee, with the purpose of preventing any concert of action with them, has refused to give complainant the names of the subscribers. Notwithstanding this, he has obtained the names of some of them, which are set out in the bill. Among these is Theodore Cook, a citizen of the state of Pennsylvania. That McLane, on 24th October, 1896, requested the signers of this agreement to send him their certificates of stock, indorsed and assigned to him. That many did so and that some declined. That a very large majority of those who assented to this did so solely under the expectation that a pending offer of $125 per share would be accepted, and with no purpose of tying up the stock for five years or of perpetuating the power of Hoffman and his associates. That Theodore Cook, one of the signers of the pooling agreement, held certificate No. 754, for 153 shares. That he had indorsed a blank assignment thereon, and had sent it to McLane as requested. That afterwards he sold it to complainant for value. That complainant thereupon demanded the certificate from McLane, which demand was refused. That subsequently he learned that the committee did not have the certificate, but that the same had been illegally and fraudulently transferred to Louis McLane, chairman, had been without authority surrendered to the company for cancellation, and a new certificate for said 153 shares had been issued in the name of Louis McLane, the canceled certificate being now in the custody of the treasurer of the Seaboard & Roanoke Railroad Company, at Portsmouth, Va. That McLane and his associates claim the right to vote on these 153 shares. The bill then charges that this pooling agreement is revocable by each signing, in so far as it delegates authority to vote. That if it be attempted to be made binding it is contrary to public policy, and is void, for many reasons stated. That, if it ever

was valid, it has been abrogated and determined because Messrs. Hoffman, McLane, and Watts negotiated a secret arrangement with persons holding 2,000 shares of stock, who were in the pool, and were dissatisfied, whereby their stock was purchased without the consent of three-fourths of the signers. That this purchase was not made with their own moneys, but with money of the Seaboard & Roanoke Railroad Company, and in the name of the Raleigh & Gaston Railroad Company,—a misuse of the funds of the first-named company for an unauthorized purchase in the name of the last-named company. That, notwithstanding this purchase, the names of the vendors still appear on the books of the company as stockholders, and that the stock will be voted in their several names, thus violating the provision of the charter as to the graduated vote or stock. That all efforts of complainant to examine the books of the company so as to verify this fact have been refused and frustrated by the treasurer of the company. Besides this, the bill charges that there are some 1,600 shares, held by citizens of New York, associates of complainant, and that Hoffman and his associates have recently obtained an injunction out of the circuit court of the city of Portsmouth, restraining them from voting.

Upon these averments of the bill the complainant prayed: (1) That defendants be served with process. (2) That the cancellation of certificate No. 754, for 153 shares, be vacated, that the certificate issued in lieu thereof be erased and canceled, and that complainant be held the true owner of the shares represented thereby. (3) That the pooling agreement be declared null and void; that the pool be wound up; that McLane and Watts be enjoined from exercising any authority by virtue thereof; and, if necessary, that a receiver be appointed to take charge of the certificates lodged with McLane. (4) That the purchase of the 2,000 shares in the name of the Raleigh & Gaston Railroad Company be declared null and void; that Messrs. McLane and Watts be enjoined from voting on the 153 shares in certificate No. 754; that they be enjoined from voting on any shares in the pool; that they be enjoined from voting on any of the shares purchased in the name of the Raleigh & Gaston Railroad Company, either in the name of that company or in the names of the vendors of the stock.

Upon the presentation of the bill, a rule was issued to the defendants to show cause why the injunction prayed for be not granted, with the ordinary restraining order meanwhile. To this order was added:

"It being further made to appear to the court by affidavits that the complainant herein, as stockholder of the said Seaboard & Roanoke Railroad Company, has been denied the inspection of the corporate books, papers, and accounts, and that the officers thereof refused to voluntarily furnish any information whatever as to such corporate transactions, it is thereupon ordered and decreed that J. Alston Cabell, Esq., be, and he is hereby, appointed special master in this case, with full authority to administer oaths and to take testimony, either within or without the district, upon the application of either party, such testimony to be used upon the hearing of the motion for injunction. The said special master shall have full authority to compel the attendance of witnesses, and order the production before him of all books, contracts, records, vouchers, papers, and documents appertaining to the allegations set out in the bill. That he give proper notice of references. That he finish the examination with all convenient speed, and file his report."

Upon receiving notice of the filing of the bill and of the restraining order, the defendants filed separate pleas to the jurisdiction of the court. These pleas, in effect, were that all of the defendants named but two of them were nonresidents of the Eastern district of Virginia; that they were not liable to suit except in the district of their residence, under the provisions of the act of congress of 1887, corrected in 1888.

This plea to the jurisdiction having been filed, the court directed the special master to suspend his references until the pleas could be heard and determined. They came on to be heard, and on December 4, 1897, a decision was filed. The plea was sustained, and the bill was dismissed as to the Raleigh & Gaston Railroad Company, it being a resident of North Carolina. So, also, the pleas of Messrs. Trippe, Minis, and Fisher were sustained, they being residents of Maryland.

After stating the main facts, the decision of the court goes on:

"So far as the claim for the delivery of the certificate No. 754 is concerned, inasmuch as that is within the district, personal property, the title to which is clouded and possession of which is sought, the bill is within the act of 1875. As Mr. Hoffman is president of the company holding the certificate whose action is necessary to obtaining full relief respecting it, and as Mr. McLane has a certificate issued upon surrender of this certificate No. 754, they are parties who can be served notwithstanding their nonresidence. The pleas based upon their presence as parties are overruled, and the defendants have leave to answer over. The pleas of the other defendants are sustained, and the bill as to them dismissed."

A decretal order was entered accordingly. The defendants, as against whom the bill was retained, were ordered to plead, answer, or demur on or before the rule day in February then next ensuing. The special master was directed to execute the order of reference which had been suspended because of the pleas. The 8th of February (the day next after the rule day) was fixed for hearing the motion for injunction. On 7th January next after filing the above decision, the defendants filed demurrers and plea to the bill. They will be set out in full hereafter. The complainant did not reply to the plea, or set it and the demurrers for hearing, as required by equity rules Nos. 38 and 33.

In January, 1898, after plea and demurrer, Mr. Crawford, who, up to that time, had been on the record for complainant, informed the judge who had heard the case that he had ceased to represent the complainant in this court, and that other counsel would be substituted for him. It seems that Mr Elihu Root, of New York, was the substitute of Mr. Crawford, and he retained Mr. Marbury, of Baltimore, Mr. Groner, of Norfolk, and Messrs. Stiles & Holladay, of Richmond, as his associates. Nothing of these appears in the records of the clerk's office. No steps were taken until 19th of July of this year, when the counsel of defendants moved, in open court at Norfolk, for the dismissal of the bill, for the want of observance of rules 33 and 38. This motion was without notice to counsel. None is required. Mr. Groner, however, was near the court, and, his attention having been invited by counsel to the motion, he asked for time upon it, which was granted, and the 20th September, 1898, was fixed for hearing the motion by his honor, Judge Waddill, presiding.

Soon after the following notice was given by counsel for plaintiff:

"Take notice that the undersigned, Thomas F. Ryan, plaintiff in the equity cause depending in the circuit court of the United States for the Eastern district of Virginia, under the short style of Thomas F. Ryan v. Seaboard & Roanoke Railroad Company, will appear before Hon. Charles H. Simonton, one of the circuit judges of said court, at Asheville, N. C., on August 16, 1898, at 10 a. m., or as soon thereafter as counsel can be heard, for the following purposes, namely: (1) For an order directing J. Alston Cabell, Esq., special master, to proceed immediately to take testimony as directed by the order in the above-styled cause of October 2, 1897. (2) For an order granting plaintiff authority and power, in person ' or by his agents and expert accountants, to examine the stock book, and all books, contracts, records, vouchers, papers, and documents, of the Seaboard & Roanoke Railroad Company, or under its control, which he may deem important to the protection of his interests. (3) For an order vacating, modifying, or changing the order of 10th July, 1898, and disposing of the defendants' motion on which said order was' granted, and for an order to set down for argument the demurrers in this case, and for permission to perfect the pleadings, as he may be advised. (4) To set down the demurrers forthwith for argument, if the court should hold that they be heard before taking testimony."

And an order was made thereon setting the motion for hearing on the day named. This order was made upon the distinct notice that the motion would be heard subject to the motion to dismiss. Judge Waddill having signified his consent that this motion to dismiss should be heard by the circuit judge, anticipating the day fixed for it, the matter comes up now. Under the direction of the circuit judge, the whole question was taken up and argued, first as to the motion to dismiss under rule 38, and in case, after consideration, the court should not grant this motion, then as to the plea and demurrers.

First, then, as to the motion to dismiss under rule 38. Were this rule absolute in its terms, there would seem to be little or no question. It is true that the rule seems to have been very little observed in this district. And it is also true that in the clerk's office there is no book in which to set down formally an order for hearing plea or demurrer under the rule. But the rule nevertheless exists and is so of force. Neither counsel nor the court take the rules of practice from the clerk's office. Nor can the failure of one district to observe a rule make it obsolete even in that district. It may explain the nonobservance by counsel. It can scarcely be said that it can excuse it. The rule, however, is not absolute. It has a qualification,— "the bill shall be dismissed as of course unless a judge of the court shall allow him further time for the purpose." The omission to observe the rule was not the default of complainant. It must be imputed to his counsel. As soon as Mr. Crawford retired, he at once employed Mr. Root, and he, in turn, without delay, engaged local counsel, both in Maryland and Virginia. These gentlemen have explained their delay.

The gravity of the charges in the bill, against gentlemen of character and standing, naturally and properly induced men of standing in the profession to pause before going into a case in which these charges must be maintained. They felt it due to the defendants, as well as themselves, to examine carefully their ground before undertaking a case abandoned by the original counsel in it. This rule was intend-

ed as a stimulant to parties to make progress in a cause; to perfect the ends of justice,—"Ut sit finis litium." So the rules have always been held to be under the control of the court, to be suspended or modified, or to be enforced, if these ends could not be subserved in any other way. Electrolibration Co. v. Jackson, 52 Fed. 773; Poultney v. City of La Fayette, 12 Pet. 472. Were this motion to be granted and the bill dismissed, this litigation would not be ended. No judgment entered on such dismissal would make the matters in dispute here res judicata. A judgment on demurrer will not operate as res judicata; a fortiori, a judgment for not following a rule of court will not. Gould v. Railroad, 91 U. S. 526. "Where the judgment upon the former action is upon demurrer to the declaration, the estoppel extends only to the exact point raised by the pleadings or decided, and does not operate as a bar to a second suit for other breaches of the same covenant." Wiggins Ferry Co. v. Ohio & M. Ry. Co., 142 U. S. 410, 12 Sup. Ct. 192.

It will also be noted that the hearing of the cause on the injunction was fixed for 8th February, the 7th (rule day) not suiting the convenience of the court. The counsel then in charge of the cause may well have supposed that on that hearing the demurrer and plea would be discussed, and the necessity for formally setting them down for a hearing be dispensed with. In the exercise of the discretion allowed by the rule, the bill will not be dismissed.

The plea and demurrers will now be taken up and discussed. The demurrers are by the Seaboard & Roanoke Railroad Company, by Louis McLane, and by R. C. Hoffman. The plea is by Louis McLane. The demurrers are: (1) That there is no equity in the bill. (2) For want of proper parties to the bill, in that the bill seeks an injunction against voting stock standing in the name of certain parties to the aggregate amount of 2,000 shares, charged to have been purchased by the Raleigh & Gaston Railroad Company, and those persons in whose names the stock stands are not made parties to the bill; in that the bill prays an injunction against the voting of the stock in the pool by Louis McLane and L. R. Watts, and the persons holding this stock are not parties to the bill; in that the bill seeks to declare the pooling agreement absolutely null and void, and to have a receiver appointed for the certificates in the pool, and the persons parties to said pooling agreement are not parties to this bill. (3) That the matter in dispute is less than $2,000. (4) R. C. Hoffman and the Seaboard & Roanoke Railroad further demur to the bill as multifarious.

With regard to the objection to the bill for want of equity, it is not well taken. The jurisdiction of the court has been sustained because it seeks to recover a certificate of stock, charged to have been fraudulently surrendered by Louis McLane for cancellation, which was canceled, and a new certificate issued therefor, which certificate is now outstanding. The bill prays that this cancellation be declared illegal; that the canceled certificate be restored; the rights of complainant therein recognized and established; the substituted certificate declared null and void. All these modes of relief are within the peculiar power of a court of equity, and cannot be had in a court of law.

With regard to the objection as to the value of the matter in dispute, that also is not well taken.    Complainant claims that he is the owner of a certain amount of stock (153 shares), of the par value of, $100,—shares valued by defendants themselves at $125 each; that, to the maintenance of his title to this stock, the possession of the original certificate No. 754 is necessary, as he cannot get a certificate therefor in his own name without presenting the same for cancellation; that the possession and control of this certificate have been unlawfully taken by Louis McLane, and fraudulently used in obtaining a new certificate for these same shares in his own name.    The possession and control of this certificate, therefore, involve the title to 153 shares;  par value, $15,300.

The demurrers for want of parties raise grave questions.    As has been seen, the jurisdiction of the court has been sustained because of the controversy over the certificate for 153 shares, No. 754, now lying canceled in the office of the Seaboard & Roanoke Railroad Company at Portsmouth, Va., within this district.    The complainant avers that this certificate is lawfully his property, purchased by him from Theodore Cook, in whose name it stood; that he is entitled to its possession, so that upon its surrender he may obtain a new certificate in his own name, and be clothed with all the rights of ownership, including the voting power thereon; that he has been obstructed in and deprived of his rights, not only by the illegal act of McLane, in transferring the stock to himself, but also by the provisions of the pooling agreement whereby the persons in the pool are held bound, unless three-fourths of the stock in the pool consent not to dispose of their stock within five years, and not to exercise the voting power thereon except in person or by McLane and Watts' proxies named for this purpose.    So that it is essentially necessary, in order to give the complainant all that he claims,—the recognition of his purchase from Cook, the transfer of the stock to him, and the exercise of the voting power thereon, as he may wish,—that the pooling agreement be declared null and void, either ab initio or by the subsequent action of McLane and Watts in purchasing the 2,000 shares in the name of the Raleigh & Gaston Railroad Company.    Can this be done without the presence or representation of the persons in the pool as such?

The pooling agreement was made 2d October, 1896.    It purports to be by the "undersigned owners and holders of stock" in the Seaboard & Roanoke Railroad Company, covenanting and agreeing, each with the other, for "our" mutual protection.    The covenant is that each of them will not for the period of 5 years from that date, or until 30 days after the abrogation of the agreement, by the written consent of three-fourths of the aggregate amount of stock therein, sell or otherwise dispose of their holdings, or any part thereof, or delegate the voting power thereof, to any person not a party to the agreement. This last clause is further qualified by appointing Louis McLane, Moncure Robinson, and Legh R. Watts a committee to represent the pool, to manage and control the shares of stock therein, and the voting power thereof, to the extent that the members of that committee, or such of them as may be present at any meeting of the company, shall have the right to vote at such meeting the shares of stock held by any

of the parties to the agreement who may be absent from the meeting. The main features of this agreement are that no stockholder in the pool will for five years sell or dispose of his stock, except by the written consent of three-fourths of the stock in the pool; and that he will either exercise the voting power thereof in person, or, if he be absent, have it exercised by McLane, Watts, and Robinson, or such of the three as may be present at the meeting.

Now, this agreement was made by each person in the pool with every other person in the pool, each for himself and his personal representatives. The consideration was for "our mutual protection." It was to be binding on each one unless three-fourths of the stock in the pool consented to release the person. Every signer, therefore, has a direct, personal, immediate interest in the validity and construction of this agreement. Every one who has observed its covenants from its date has the right, if it be valid, to enforce and maintain it; and, under the familiar rule in equity that all persons in interest must be parties to the suit, each signer of this paper must be a party in person or by representation. As they must, in the nature of things, be numerous, they can be represented by one or more persons in the same plight and interest as themselves. They are not parties in person in this suit. Are they represented? It is contended that, inasmuch as Messrs. McLane, Watts, and Hoffman are among the signers of this pooling agreement, they can and do represent the others whose names appear to it. But the pooling agreement is attacked and sought to be invalidated because of the wicked and fraudulent purpose underlying it,—the scheme devised by these very persons to perpetuate their own power in the corporation for the purpose of using all the corporate powers and opportunities to their own gain and to the great detriment and wrong of the stockholders. More than this, it is charged that the sole purpose of the stockholders who went into this pool was to secure the advantages of a pending offer of $125 per share for their stock; and that, owing to the fraudulent practice of these three persons, they were inveigled into putting into their hands an absolute lease of power for five years,—a power shockingly abused. How, then, can it be said that Messrs. Hoffman, McLane, and Watts are the representatives of the unfortunate persons in the pool, who are their unwilling victims, whose rights they are defrauding, and whom they have by a trap misled into a surrender of their rights?

It is said that Messrs. Watts, McLane, and Robinson are a committee to represent the pool. But their agency is limited and qualified to this extent: They can vote the stock of those who are absent. Those who are present have an unlimited vote and an unlimited choice.

It is said, however, that the complainant does not know who are in the pool, and that such information has been refused to him by Mr. McLane. It does not seem clear that he had the right to demand or that McLane was bound to furnish him this information. There is no privity whatever between them. He denies absolutely the validity of McLane's connection with the pool; the legal existence of the agreement; its obligation upon Cook or himself. He makes the most grave charges against Mr. McLane, and seeks this information

to establish his charges.    Mr. McLane objects to the absence of these parties, not from any supposed connection with himself in interest. On the contrary, the bill itself shows that the action of McLane, Watts, and Hoffman is not only at variance with, it is hostile to, and destructive of, the interest of these unknown signers.    If complainant wishes to make the persons in the pool parties, either individually or by representative, he must do as all litigants do,—make inquiry and discover them.    He is not required to do an impossibility.    The discussion at bar and the record of the case show that at the last general meeting of stockholders the restraining order issued in this case was served during the meeting.    This order forbade Messrs. Watts and McLane from voting the stock in the pool not represented in person.    Complainant had, then, an opportunity of knowing what stock was not voted by Messrs. McLane and Watts because of this restraining order.    The persons in the pool, or some representatives of them, are necessary parties to this suit, and this demurrer is sustained.    This conclusion necessarily modifies the restraining order so far as it relates to voting the stock in the pool.

The demurrer because of the absence of the parties who are alleged to have sold their stock to the Raleigh & Gaston Railroad Company is not well taken.    The bill alleges, and the demurrer admits, that these persons, named, have parted with all interest in this stock, and that it has been bought in the name of the railroad company.    Thenceforward they had no concern in the stock.    It makes no difference to them whether this railroad company had or had not power under its charter to buy the stock,—whether or not it made use of its funds or used the money of the Seaboard & Roanoke Railroad Company. Nor does it make any matter to them who owns the stock, what rights are involved in its ownership, and what equities are in it.    So far as they are concerned, they are out of the controversy, and no decree for or against them is needed or can be made.    In this view of the case, it is clear that, so far as the voting power on this stock is concerned, Messrs. Watts and McLane have ceased to represent the former owners of it.    We must assume, from the character of the pleadings, that these 2,000 shares have been sold, and are now in the hands of a purchaser.    This revokes all authority heretofore existing from the vendor, and the restraining order in this respect must be continued.

The next ground of demurrer is that the bill is multifarious.    This objection is presented by Mr. Hoffman and by the Seaboard & Roanoke Railroad Company.    They both of them disclaim any connection with the pooling agreement, and deny the right of the complainant to draw them into this controversy.    In the case of Barcus v. Gates, 32 C. C. A. ——, 89 Fed. 783, Judge Morris says:

"Multifariousness arises from the fact either that the transactions which form the subject-matter of the suit are so dissimilar and separate that they cannot conveniently be tried together in one record, or that some defendant is able to say, as to a large part of the transactions set out in the bill, he has no interest or connection whatever."

A bill is not multifarious because there are several causes of action. If they all grew out of the same transaction, and if all the defendants are interested in the same rights, and the relief against each of the

same general character, the bill may be sustained. Brown v. Deposit Co., 128 U. S. 403, 9 Sup. Ct. 127.

In Salvidge v. Hyde, 5 Madd. 146, it is thus put:

"If the object of the suit be single, but it happens that different persons have separate interests in distinct questions which arise out of that single object, it necessarily follows that such different persons must be brought before the court in order that the suit may conclude the whole object."

This suit has been sustained because it seeks to obtain possession of, and to remove a cloud on the title of, a piece of personal property,—a certificate of stock within this district,—the possession of this certificate being an essential link in the title of the complainant. Incidentally to the removing the cloud on the title comes up the question as to the validity of the pooling agreement under which Cook, the vendor of complainant, agreed not to sell his stock, and under which he had invested Messrs. Watts, McLane, and Robinson with its voting power in case of his absence. But the object of the suit is the possession and control of the certificate No. 754 for 153 shares. That certificate is in the possession of the defendant the Seaboard & Roanoke Railroad Company. To get possession of it, the decree must go to this company. Mr. R. C. Hoffman is president of this company. To afford complainant the attainment of his object, if this relief is given him, the president of the company must direct the return of the canceled certificate, and must issue the new certificate, and the decree must go to him also. So, being the president, he is a proper and a necessary party to the suit. The demurrer on this ground is overruled.

The next matter for investigation is the plea set up by the defendant Louis McLane. This plea sets out that on 11th May, 1897, this complainant exhibited his bill of complaint in the circuit court of the United States for the district of Maryland, against him, Louis McLane, Legh R. Watts, and the administrator of Moncure Robinson, to which bill the defendants had answered and which proceedings are now pending; that the same matters and questions are involved in said proceedings in said circuit court in Maryland as are involved in the present bill. By the exhibit filed with the plea, setting out these proceedings, it appears that in them the validity of the claim of complainant to the 153 shares of stock in certificate No. 754 is maintained, the pooling agreement is sought to be declared null and void, and the same positions taken thereto as in this bill. It was stated at bar during the argument that this bill had been amended, and a copy of the amendment was shown to the court. In said amendment all the allegations of the bill in this case were substantially, if not literally, inserted.

Is the plea of pendency of a suit in one circuit court of the United States a bar to a suit on the same subject-matter between the same parties in another circuit court of the United States? It was stated at bar, by counsel of learning and research, that no case could be found directly in point on this question. The pendency of a suit in a state court is not necessarily a bar to a suit in the federal court between the same parties and involving the same issues. Stanton v. Embrey, 93 U. S. 548; Gordon v. Gilfoil, 99 U. S. 168; Marks v.

Marks, 75 Fed. 321. Perhaps the same rule would be applied in such a case as this. Indeed, cases of this character are not apt to arise in the federal courts. Under the act of 1887–88, a defendant cannot be sued outside of the district of his residence, except in the cases provided for in the act of 1875. But, after all, the question presented to the court on such a plea is one of comity between courts. When a court has assumed jurisdiction of a subject, all other courts should refrain from interference. In no other way can be prevented unseemly conflict between courts. In the present case, the pleadings having disclosed the fact that the important question of the validity, force, and effect of this pooling agreement has already been presented to the circuit court for the district of Maryland, this court will at least stay its hand, and, without dismissing the case from this court, suspend all action, until the circuit court of Maryland has made its decision, or until the pleadings in that court be determined, either by election on the part of the complainant to abandon them and proceed in this court, or in any other way. At this hearing the complainant submitted his motions pursuant to notice. The conclusions reached, as above set forth, show that the case is not ripe for hearing the motion for injunction, and that it is not expedient that the special master should, for the present, begin and hold references. Nor is it at this time necessary to pass any order respecting the examination or inspection of the books, papers, and documents of the Seaboard & Roanoke Railroad Company, if, indeed, from the light thrown upon the issues in this case by the pleadings and argument, such an inspection should either become necessary or proper. The other motions have been substantially granted.

It is ordered that the complainant have leave, if he be so advised, to amend his complaint so as to make the signers of the pooling agreement, or some representative or representatives of them, parties to this suit. It is further ordered that the proceedings in this cause in this court be stayed until the proceedings in the circuit court of the United States for the district of Maryland, between these parties, be determined in any way.