## RYAN v. MARTIN et al.

### (Circuit Court, S. D. New York. December 18, 1908.)

**1. CORPORATIONS (§ 131*)—STOCK—TRANSFER.**

A person who has become the equitable owner of corporate stock belonging to another may compel its delivery and transfer on the books of the company.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 490; Dec. Dig. § 131.*]

**2. CORPORATIONS (§ 131*)—BROKER'S SERVICES—TRANSFER OF STOCK—SPECIFIC PERFORMANCE.**

Defendant M., representing that he owned or controlled certain mining claims, employed complainant to procure capital to purchase and operate them, whereupon complainant procured defendant L. to advance money under a contract between M. and L. for the conveyance of the claims to a corporation which they formed; it being agreed that a portion of the stock should be issued to M. in consideration of a transfer of the claims to the corporation, and that a portion of M.'s stock so issued should be transferred to L. in payment for the money which he advanced, both M. and L. agreeing that plaintiff should receive $50,000 of such stock for his commissions. M. in fact never purchased or conveyed any claims to the corporation with money furnished by L., but squandered such money, and no stock was issued to him therefor. *Held* that, while complainant under such facts had a cause of action at law for his services against M. and L., he could not maintain a bill in equity against the corporation or either M. or L. to compel a transfer of $50,000 of the corporation's stock to him; also *held*, that specific performance of Martin's agreement to convey the mining claims to the corporation could not be decreed, as it did not appear that Martin had title thereto, but the contrary, and that neither Martin nor Ryan nor Lewis had equitable title to the stock which belonged to the company.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 490; Dec. Dig. § 131.*]

**3. CANCELLATION OF INSTRUMENTS (§ 37*)—COMPLAINT.**

A complaint to set aside a stock-pooling receipt or agreement which was not set out either according to its legal effect or otherwise, and which did not state the time, place, and circumstances of its execution and delivery, nor allege the parties thereto, or that it was accepted without consideration was insufficient.

[Ed. Note.—For other cases, see Cancellation of Instruments, Cent. Dig. § 70; Dec. Dig. § 37.*]

**4. EQUITY (§ 39*)—JURISDICTION OF PART—EFFECT.**

Where equitable jurisdiction of a material part of a cause of action appears, equity will assume jurisdiction to determine the entire controversy.

[Ed. Note.—For other cases, see Equity, Cent. Dig. § 104; Dec. Dig. § 39.*]

**5. EQUITY (§ 150*)—BILL—MULTIFARIOUSNESS.**

A bill against a corporation and two of its promoters to compel specific performance of a contract to cause to be transferred to complainant $50,-000 of the corporation's stock in consideration of his services was not multifarious.

[Ed. Note.—For other cases, see Equity, Dec. Dig. § 150.*]

In Equity. Separate demurrers by defendants, Tom Moore Gold Mining Company and Arthur B. Lewis, to bill of complaint.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Michael J. Kelly, for complainant.
John Baptist Marshall, for defendant Arthur B. Lewis.
Philip Carpenter, for defendant Tom Moore Gold Min. Co.

RAY, District Judge. The demurrers challenge the sufficiency of the complaint in two regards: (1) The Tom Moore Gold Mining Company says that several separate and distinct and independent matters are involved and charged with which it has no concern and in which it ought not to be implicated; (2) that complainant has not complied with rule 94 of Equity Practice; and (3) that complainant has not stated facts entitling him to any of the relief demanded; and Lewis says that complainant has not stated any such case as entitles him to any such relief as is demanded in the bill.

The complainant, Dennis Ryan, is a citizen of the state of Minnesota; defendant Martin is a citizen of the state of Colorado; defendant Lewis is a citizen of the state of New York, and an inhabitant of the Southern district; while the defendant Tom Moore Gold Mining Company was organized under the laws of the state of Maine, but has its principal office or place of business in the city of New York. The defendant Title Guarantee & Trust Company is a corporation of the state of New York. The bill of complaint alleges that the defendant "Samuel G. Martin, desiring to procure money to purchase and work a certain group of mines, mining claims and property," describing them, and which properties the bill of complaint alleges, except perhaps Crown Mountain group, then belonged to the Tom Moore Mining & Milling Company, a corporation of the state of Colorado, represented to the complainant that:

"He was the owner of said mines, mining claims, and mine property, which he claimed to be very valuable, either individually, or as a stockholder owning almost all the capital stock of the said Tom Moore Mining & Milling Company, a corporation organized under the laws of the state of Colorado, and what capital stock of said company he did not own he could purchase by the use of the money or capital he desired to procure, and would purchase the said Crown Mountain group of mines from a receiver who had been appointed in some court in Colorado, the name of which is unknown to your orator, to take possession of the Crown Mountain group of mines, and who had taken possession of them, and had offered or was about to offer them for sale by means of said money or capital so desired by him, if it were procured."

That thereupon, and on or about December 24, 1906, the said Martin at the time of making such representations "retained and employed" the complainant "to procure said money or capital" for the purposes stated, and promised to pay the complainant for his services in procuring said money or capital if he were successful in procuring the money. That on or about January 3, 1907, the complainant introduced Martin to Lewis, a capitalist or person able to furnish and supply the money desired, and negotiated with Lewis for his supplying and furnishing the said money, and "was the procuring cause in obtaining said money or capital which the said Arthur B. Lewis agreed to supply and furnish and did supply and furnish" to the extent set forth in the bill, and "until prevented from continuing to so supply and furnish said money or capital by the actions of said Martin." That in pursuance of such negotiations and services of the complain-

ant, and through him as the procuring cause, the said Lewis and Martin entered into a written agreement, set out in full in the bill, which recites the desire of Martin to procure the money for the purposes above mentioned, and contains the following agreements, viz.:

(1) Lewis agrees to incorporate at his own expense, under the laws of the state of Maine, a company with a capital stock of $10,000,000, divided into 1,000,000 shares of $10 per share, par, face value, fully paid, which company is to be called and entitled "The Tom Moore Gold Mining Company," to be organized forthwith with a board of directors of five members, and when organized and in existence Martin agrees with Lewis to grant and convey, or cause to be granted and conveyed, to the said company, by good and sufficient deeds, all of the said properties described therein, being the same mentioned between Martin and Ryan, for and in consideration of 999,995 shares, all but 5 shares of the said stock of the said company to be formed.

(2) Martin agrees with Lewis to deposit as an escrow in the Title Guarantee & Trust Company of the city of New York 600,000 shares of the said stock when issued and allotted to him, Martin, to be delivered to Lewis or his assigns from time to time on payment to the trust company, for the benefit of the treasury of the Tom Moore Gold Mining Company, of the sum of $600,000 to be paid by Lewis, viz., $10,000 on or before February 1, 1907, when Lewis may draw 10,000 shares of the stock; $10,000 each and every month thereafter, provided that on or before February 1, 1908, Lewis will have deposited at least $250,000, for which Lewis will be entitled to draw from time to time shares of stock at the rate of $1 per share net to the said mining company; and after February 1, 1908, Lewis is to deposit $350,000 to the credit of the treasury of the mining company, and the shares are to be delivered to Lewis on such deposits being made from time to time at the same rate. The minimum to be paid in is $10,000 per month, and time is made, by express words, of the essence of the contract; and, if Lewis fails to fulfill on his part, Martin may declare the agreement null and void, and any of the 600,000 shares not then taken over under the provisions of the agreement are to remain as treasury shares of the said mining company, and be disposed of by the board of directors at not less than $1 net per share to the mining company.

Lewis agrees to organize the company, to make the payments, to furnish the money to purchase the said Crown Mountain group of mines, a part of the property before mentioned, and he is to withdraw stock at the rate of $1 per share for whatever sum he pays for such property. This is the condition on which said Martin agrees to convey that part of the property to the mining company.

(3) It is agreed that 500,001 shares of the stock of the mining company is to be deposited with the Title Guarantee & Trust Company, that being a controlling interest in such mining company, to be held in trust for two years "or during the existence of this option," and same is not to be subject to withdrawal by either Martin or Lewis. Of this 500,001 shares Martin is to deposit 350,000 shares and Lewis the balance; Martin, Lewis, and a third person to be selected by them are to vote these shares. The trustees are to issue certificates showing

the interests of the parties to the agreement, which should be transferable.

The bill of complaint then alleges that the mining company was organized and incorporated January 23, 1907; that said Arthur B. Lewis is its president, Dennis Ryan, complainant, vice president, William J. Donaldson, assistant treasurer and secretary, and that said Lewis, Martin, Donaldson, and Ryan are its directors.

The bill then alleges, on information and belief, as follows: That no meeting of the stockholders of the mining company has ever been held; that no meeting of the directors has ever been held except for the purpose of organization and the election of officers; that the 500,-001 shares of stock have been deposited and are now held by the title company; that although Martin has received between $70,000 and $100,000 from Lewis, under said agreement, he has wholly failed, neglected, and refused to make, execute, and deliver the deeds or a deed of the property, or to account for the disposition of said funds to the company or to said Lewis, and that such funds were not placed in the treasury of the mining company, as they should have been, but that Martin has spent same extravagantly, wastefully, without accountability, and without consultation or approval or supervision by the officers or directors of the corporation, and not for the development of said mines, mining claims, and mining properties, but has, notwithstanding all this, been suffered and permitted to obtain and keep all of the capital stock of said company, except said 500,001 shares—that is, 499,999 shares of same; that no part of its capital stock has ever been issued to the company or deposited in its treasury or delivered to its treasurer; that Martin has not purchased the Crown Mountain group of mines, although furnished by Lewis with sufficient funds to do so. The bill then alleges that prior to the incorporation of the said Tom Moore Gold Mining Company "it was agreed by said Samuel G. Martin and said Arthur B. Lewis that your orator (the complainant) should receive as a consideration for his services fifty thousand shares (50,000) of the capital stock fully paid, and nonassessable of the company about to be incorporated and organized or caused to be incorporated and organized by said Arthur B. Lewis under said agreement," and that neither said 50,000 shares nor any part of same have ever been delivered to the complainant, or noted, recorded, or placed in complainant's name upon any of the books of the company. The bill then charges that the apparent or ostensible reason why said shares have not been delivered to complainant is that "he received or accepted a certain pooling receipt or memorandum which pretended or assumed to tie up or lock up his said stock for two years from on or about January 17, 1907, and which your orator is informed and believes and alleges is wholly nugatory and void and without consideration and of no avail as against your orator."

The bill then alleges that the amount in controversy exceeds $2,000, exclusive of interest and costs, and demands a decree:

(a) That Martin be required and compelled to execute and deliver to the mining company deeds of the said properties.

(b) That he be required and compelled to account to the company

for the funds and moneys paid him by Lewis, and furnish vouchers for his expenditures thereof.

(c) That he be required to return to the company all the shares of stock he is not entitled to or does not own.

(d) That the Tom Moore Gold Mining Company be enjoined from transferring on the books of the company all shares of stock which Martin has become possessed of without right until he accounts, etc.

(e) That the Title Guarantee & Trust Company be enjoined from surrendering or delivering to Martin and Lewis individually any part of the stock held by it, but that it be compelled to deliver same to the said Tom Moore Gold Mining Company to await the delivery of good and sufficient deeds of said properties.

(f) That complainant is entitled for his said services and is the owner of 50,000 shares of the stock of said Tom Moore Gold Mining Company; that same may be placed, noted, recorded, or registered in the books of the said company in his name as its owner, and that the said number of shares of said stock may be delivered to him for his said services.

(g) That the said pooling receipt or memorandum may be declared nugatory and void, and without consideration, and unavailing as against the complainant and all others similarly situated.

(h) That Lewis be enjoined from surrendering or delivering to Martin any capital stock of said company belonging to said company, or complainant, or to any other person, or any books or vouchers belonging to said Tom Moore Company until said Martin has accounted for moneys received and executed and delivered deeds of said properties.

(i) That Martin be enjoined from entering on or working mines, etc., on said properties, or removing ores, etc., therefrom, until he has executed and delivered deeds of said properties to said company.

(j) That the defendants and each of them make discovery and exhibit to this court all contracts, agreements, options, pooling memoranda, etc., made by or between them or any of them relating to the subject-matters of the bill of complaint.

I find no allegation in the bill of complaint that Samuel G. Martin ever was, or that he has ever become, the owner of the properties described in the bill of complaint, or of any of them, or of any part of same. The allegation, as to all but the Crown Mountain group, is that they were owned by a Colorado corporation, but that Martin represented to the complainant either that he was the owner of same, or that he owned most all of the stock of said corporation, and that what of the stock he did not own he would purchase by the use of capital he desired to secure, and that he would also purchase the Crown Mountain group of mines from a receiver who had been appointed by some court in Colorado. It will be remarked that the most of these representations are promissory, and there is no charge that any of them were actually false or fraudulent or made with intent to defraud, or that they did mislead any one. The fair inference is perhaps that Martin represented that he owned some of them individually, and the others by owning most of the stock of the company which did own them. However this may be, the allegations are that Martin did not

own any of them, and there is no allegation that he now owns or ever has owned any of these mining properties.

There is no allegation in the bill that complainant is a stockholder in the defendant corporation, or that he ever paid it anything by way of services, cash, or otherwise, or that it has ever agreed to deliver or issue to him any of its stock, or that the corporation, the Tom Moore Gold Mining Company, has ever in any way ratified or assented to the agreement made by defendants Martin and Lewis to give complainant shares of its stock in compensation for his services to them in bringing about conditions which resulted in the organization and incorporation of the company, or that it has ever agreed to carry out that agreement. The complainant performed services in securing money or capital at the request of and for Martin, who agreed to pay him therefor, and subsequently, and before the defendant company was ever organized or incorporated, Martin and Lewis, who had agreed to form the company, agreed that complainant should receive for his said services and as a consideration therefor 50,000 shares of the capital stock of the company to be organized and incorporated. This agreement has not been kept or performed. No one has ever assumed the obligation, so far as appears. These allegations seem to constitute a good cause of action either at law or in equity against both Martin and Lewis, for Lewis, having shared in the transaction and reaped its benefits and received value, agreed that complainant should have these shares of stock as his compensation. However, he never agreed to pay in any other way, mode, or manner. I do not see that Lewis is liable to Ryan, the complainant in an action at law. Martin is clearly liable in an action at law for damages for breach of his contract. Has a case been stated for equitable relief as against Martin and Lewis, or as against Lewis? Has Lewis become the owner of any of this stock, or has Ryan, the complainant, become the equitable owner of any of it? If so, Ryan may compel its delivery and transfer on the books of the company, and having the case before it, perchance, the court may dispose of the whole matter and do full equity in the premises. If not so, this suit cannot be maintained, for clearly it is not a stockholder's action, and the moment we resolve it into one we are confronted by equity rule 94, and the bill is devoid of equity and may be demurred to. Venner v. Great Northern Railway, 209 U. S. 24, 35, 28 Sup. Ct. 328, 52 L. Ed. 666; Hawes v. Oakland, 104 U. S. 450, 26 L. Ed. 827.

The company, when incorporated by agreement between Martin and Lewis, was to have a deed or deeds from Martin of all the properties mentioned, who was to receive all the capital stock, except 5 shares, as the consideration therefor. As Martin has never conveyed the properties mentioned, or any of them, and so far as appears, has never become the owner of same, or of any part thereof, it is difficult to understand how Martin has become the owner in law or in equity of a single share of this stock. As Lewis was to get his shares of stock from Martin, it is difficult to understand by what right Lewis is entitled to a single share of this stock from the company. He has never paid it anything, and it has never agreed to deliver him any of the stock. For a court of equity to compel Martin to deliver stock

of this company, which he does not own and in and to which he has no legal or equitable title, to the complainant, Dennis Ryan, in payment of a debt owing to him by Martin and in execution of an agreement made by Martin and Lewis, who, so far as appears, are engaged in some sort of fraud, would seem most unjust to the company and to the public, who might be induced to take or purchase the stock and part with good money. It is not alleged that the certificates for shares of stock in the hands of Martin and those placed with the Title Guarantee & Trust Company, or either, were issued for a consideration, and no fact is stated indicating that it ought to go out of their hands unless to be returned to the company itself. In fact, the exact contrary appears on the face of the bill. The certificates of stock ought to be with the treasurer of the company, and ought not to be issued to any one until Martin conveys the properties to it. It is true that the bill alleges that Lewis has paid between seventy and one hundred thousand dollars to Martin, but this money has not gone into the treasury of the company or to any of its officers, or in payment for stock, or for the benefit of the company. The bill charges that Martin has misappropriated, misapplied, and wasted same. This fact does not give Martin or Lewis title, legal or equitable, to this stock, so far as appears. But it is said that if Martin is compelled to deed these properties to the Tom Moore Gold Mining Company, then Martin will become the owner of the stock, and Lewis will be entitled to his share thereof, and that then complainant will be entitled to his 50,000 shares from Martin; that complainant has an equitable right to have all this done; that is, that he may compel specific performance of the agreement between Martin and Lewis, which should inure for and to the benefit of the Tom Moore Gold Mining Company and to the benefit of Martin, by giving him title to the stock, and thus to the benefit of complainant, who thereby, through the exercise of the equitable power of the court, would get his pay for his services.

But how is a court of equity to compel Martin to convey property which he does not own to the Tom Moore Gold Mining Company? This court could not compel the execution of its decree, should it make one containing such a provision. It is well settled that a court of equity cannot decree the specific performance of a contract to convey property to which the defendant has no title, and a bill by the vendee against the vendor for specific performance which does not show title in the defendant is bad on demurrer. Kennedy v. Hazelton, 128 U. S. 667, 671, 9 Sup. Ct. 202, 32 L. Ed. 576, and cases there cited; Howe v. Howe, etc., 154 Fed. 820, 828, 83 C. C. A. 536; Hildreth v. Thibodeau (C. C.) 117 Fed. 146, 148; Hann v. Culver, 73 Hun (N. Y.) 109, 25 N. Y. Supp. 880; Stevenson v. Buxton, 15 Abb. Prac. (N. Y.) 352; Id., 37 Barb. (N. Y.) 13, reversing 8 Abb. Prac. (N. Y.) 414.

In Kennedy v. Hazelton, supra, the Supreme Court of the United States, per Gray, giving the opinion, said:

"A court of chancery cannot decree specific performance of an agreement to convey property which has no existence, or to which the defendant has no title. A bill by vendee against vendor for specific performance, which does not show any title in the defendant, is bad on demurrer. And if it appears,

by the bill or otherwise, that the want of title (even if caused by the defendant's own act, as by his conveyance to a bona fide purchaser) was known to the plaintiff at the time of beginning the suit, the bill will not be retained for assessment of damages, but must be dismissed, and the plaintiff left to his remedy at law. Columbine v. Chichester, 2 Phillips, 27; s. c., 1 Coop temp. Cottenham, 295; Ferguson v. Wilson, L. R. 2 Ch. 77; Kempshall v. Stone, 5 Johns. Ch. (N. Y.) 193; Morss v. Elmendorf, 11 Paige (N. Y.) 277; Milkman v. Ordway, 106 Mass. 232, 256."

This, it seems to me, ends this case, as the complainant has ample remedy at law against Martin to recover damages for breach of contract or to recover the value of his services, and this stock of the company ought not to issue to any one unless it first has the property or cash is paid for the stock. There is no privity of contract between the complainant and the defendant Tom Moore Gold Mining Company, no contractual relations whatever. It seems that something like 5 shares of this stock may be owned somewhere. Possibly they were issued to the complainants, Ryan, Lewis, Donaldson, and Martin to enable them to become directors. But, as stated, this is not a stockholders' action. If Ryan is a stockholder, he can demand action by the corporation, and, if it refuses to proceed in a proper action, he may sue in his own behalf and of all similarly situated, making the corporation a party defendant, and so enforce the rights of the corporation and of all interested. As the bill of complaint stands, Ryan is not a stockholder, for he alleges that no part of the 50,000 shares has been delivered to him or put in his name; that 500,001 shares are with the Title Guarantee & Trust Company, and that Martin has "been suffered and permitted to obtain and keep all of the capital stock of said company, except said 500,001 shares; that is, 499,999 shares of same." What right has Ryan to ask the court to compel Martin to account to the company for the money paid Martin by Lewis pursuant to their agreement, and to which complainant was not a party? Or to ask the court to compel Martin to return to the company the shares of stock he, Martin, does not own, or to ask the court to enjoin the company from transferring stock to Martin on the books of the company, or to enjoin the Title Guarantee & Trust Company from surrendering, or delivering stock to Martin and Lewis, or either of them, or to enjoin Martin from entering on the properties mentioned not owned by any party to this action legally or equitably? Can this court as a court of equity decree that the complainant is entitled for his services to 50,000 shares of the capital stock of the Tom Moore Gold Mining Company, and is the owner of same, and that the same shall be registered in his name on the books of said company and be delivered to him, when the bill discloses that the right of Martin to the stock, and of Martin and Lewis to stock, from whom complainant is entitled to receive it, if from any one, depends on conditions not fulfilled, and the company does not owe complainant anything, and it also appears that this court is powerless to compel performance of the agreement to convey the mining properties to the company, so that Martin, or Lewis, or both, would be entitled to the stock? It seems to me that each of these questions answers itself in view of the facts stated and alleged.

The complainant asks this court to declare nugatory, void, and with-

out consideration a pooling receipt or memorandum which the bill impliedly states the complainant accepted. This receipt or memorandum is neither set out in the bill, nor is the legal purport or effect of its contents stated, nor is its substance stated. The time, place, and circumstances of its execution and delivery are not stated. It is not even alleged that it was in fact accepted by complainant without consideration. The parties to it, if there be parties, are not stated. It is not attached to the bill. This part of the bill is altogether too indefinite and uncertain to set a court of equity in motion, and no facts regarding that pooling receipt or memorandum are stated upon which a court of equity can base or frame an intelligent decree. The complainant contends that this case is substantially on all fours with Rogers et al. v. Penobscot Mining Company et al., 154 Fed. 606, 83 C. C. A. 380. I take the facts from the syllabus:

"The bill set forth these facts: B. and M. agreed that B. should procure options to purchase certain mining claims in M.'s name; that they should organize a corporation with 500,000 shares of stock; that this stock should be issued to M., who should place 300,000 shares of it in the treasury of the corporation, transfer 50,000 shares to B., convey the options to the corporation, and furnish the money, either by loans to the corporation or by purchase of the capital stock, to pay the unpaid balances of the purchase prices of the mining claims. B. procured the options. The corporation, the P. Co., was organized. M. conveyed the options to it, took the 500,000 shares of stock, and placed 300,000 shares in the treasury. The P. Co. paid the unpaid balances of the purchase prices of the mining claims, and M. took the deeds thereof to himself. The complainants were the assigns of 11,300 of the 50,000 shares of stock M. agreed to transfer to B., and they brought suit in equity against M. and the P. Co. to compel him to convey the mining claims to the corporation."

There M. had become and was the owner of the premises and property which it was sought to compel him to transfer to the corporation, and the facts disclosed that the stock was properly issued, and that complainants were the equitable owners of the stock assigned to them.

The complainant also relies upon Ryan v. Seaboard & R. R. Co. et al. (C. C.) 89 Fed. 397. There the court held:

"A bill alleging that plaintiff purchased from the owner certain shares of stock in defendant corporation, represented by a certificate which had been placed in the hands of another defendant under a pooling arrangement between stockholders, but that such defendant had surrendered said certificate and fraudulently procured its cancellation and the issuance of a new certificate to himself in lieu thereof, and praying the cancellation of such new certificate and the establishment of plaintiff's rights as a stockholder, states matters giving a court of equity jurisdiction."

That case was rightly decided, but it does not help the complainant here.

If I could find equitable jurisdiction—that is, allegations of fact upon which a court of equity will grant equitable relief—I would overrule the demurrer and allow the court in equity to settle the whole controversy, which it may do where it has equitable jurisdiction of a part involving the principles upon which the whole depends, or where a material part is within its equitable jurisdiction. Massie v. Watts, 6 Cranch, 148, 3 L. Ed. 181; Clarke v. White, 12 Pet. 178, 9 L. Ed. 1046; Hepburn v. Dunlop, 1 Wheat. 179, 4 L. Ed. 65; Dewing v. Perdicaries, 96 U. S. 193, 24 L. Ed. 654.

I do not think this bill is multifarious, but, on the facts stated, this court cannot properly grant complainant any of the relief demanded, or any relief, and the demurrer is sustained on that ground, with costs, but with leave to amend in 30 days on payment of such costs.